# ATTACHMENT

# UNITED STATES DISTRICT COURT
for the
District of Colorado

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
5512 Gabriel Dr. Loveland, CO 80538, including all outbuildings thereon and a Red GMC Sierra pickup truck with a Colorado plate OJL22, more fully described in Attachment A, attached hereto.

)
)
)
)
)
)
)

Case No. 20-sw-00443-MEH

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___State and___ District of ___Colorado___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    X  evidence of a crime;

    X  contraband, fruits of crime, or other items illegally possessed;

    X  property designed for use, intended for use, or used in committing a crime;

    ❑  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o) | Possession of a Machinegun |

The application is based on these facts:

    X  Continued on the attached affidavit, which is incorporated by reference.

    ❑  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent, FBI
*Printed name and title*

Sworn to before me and: ❑ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **05/01/2020**

*Michael E. Hegarty*
*Judge's signature*

City and state: ___Denver, CO___

**Michael E. Hegarty, U.S. Magistrate Judge**
*Printed name and title*

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The Subject Premises is located at 5512 Gabriel Drive, Loveland, Co, 80538. The Subject Premises is more particularly identified as a brick style house with a white exterior trim around the gutters, windows, front door. The garage door is red or maroon in color with white trim and the gutters are white in color. The front of the residence faces to the west. There are two (2) windows on the front of the residence. The west side door to the residence is dark colored and covered by outward opening exterior door with white trim and gold handle. There is concrete pathway from the driveway leading to the front door. Next to the driveway is a white light post partially surrounded by a small white picket fence. There is a red or maroon wood like placard with the number 5512 adjacent and to the right of the front door in between the south window and the garage door. There is a driveway that runs along the west side of the property leading to the garage from the street Gabriel Drive. The residence is surrounded by a wooden 6 foot privacy fence. The fence has a outward opening gate that opens to the south onto Chestnut drive. The location consists of the subject residence, surrounding property, and all outbuildings located thereon. The place to be searched includes all rooms therein, including any safes, storage containers, closets, sheds, and garages associated with the premises additionally the subject's vehicle that registers to him. This vehicle is a 2005 Red GMC Sierra pick up truck with VIN 2GTEK13TX51317517, bearing a Colorado Disabled Veteran plate OJL228.

1





2

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items, located within the residence at the Subject Premises, constitute evidence, fruits, proceeds, and instrumentalities of potential violations of Title 18 U.S.C. § 922(o) – Possession of a Machinegun (Subject Offense).

1.　　Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and variant lower receivers of any kind.

2.　　Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, machinegun conversion kits, and barrels for AR-style firearms.

3.　　Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, molds, molding equipment, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

4.　　Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents, both electronic and physical.

5.　　Any safes, locked cabinets, and/or other secured containers and/or devices at the locations identified in Attachment A. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

6.　　Any machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, machineguns and/or machinegun parts including but not limited to templates, machinegun conversion kits, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

SW_00000004

# AFFIDAVIT

I, ███████████ being duly sworn, state:

## INTRODUCTION AND AGENT BACKROUND

1. Your Affiant is a Special Agent with the United States Federal Bureau of Investigation ("FBI") and has been since July 2014. Your Affiant received four months of training in criminal investigations and related legal matters at the FBI Training Academy in Quantico, Virginia. Upon completion of training at the FBI Training Academy, your Affiant was assigned to the San Antonio Division FBI where he primarily investigated white-collar crimes, specifically those involving public corruption, as set forth in 18 U.S.C. § 1951, et seq., and other related federal criminal violations. In April 2020, your Affiant transferred to the Denver Division FBI where he primarily conducts investigations involving national security matters. Your Affiant has, through training and experience, become familiar with and used all normal methods of investigation, including, but not limited to, visual surveillance, interviewing witnesses, subpoenas, search and arrest warrants, confidential human sources, consensual monitoring, pen registers, undercover operations, and court authorized wiretaps.

2. This affidavit is in support of a search and seizure warrant for 5512 GABRIEL AVENUE, LOVELAND, CO 80538 for evidence of violations of Title 18, United States Code, Section 922(o), Possession of a Machinegun.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence,

2

fruits, and instrumentalities of violations of 18 U.S.C. §§ 922(o) are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

**PROBABLE CAUSE**

5. On 04/30/2020 at approximately 1947hrs, FBI Task Force Officer (TFO) of the Denver Police Department spoke via telephone with an individual who identified himself as _____. _____ had contacted law enforcement to report an incident described below.

6. _____ indicated that on Saturday, April 25, 2020 between approximately 12:00pm and – 5:00 pm, _____ was at the Pawnee Grasslands in an area designated for shooting firearms. At approximately 3:30pm, _____ heard fully automatic gunfire coming from over the hill. _____ indicated he knows the difference between what a bump stock and fully automatic gunfire sound like. _____ said he is an ammunition reloader and went around the hill to ask whoever was shooting if he could collect the brass for reloading. As _____ came around the hill, he saw a white male, approximately 5'8" with blonde hair and blue eyes. The male had a "flat top" style haircut. The male was wearing camouflage clothing and a tactical vest. The male placed an AR style rifle into the back of a dark colored truck (possibly a Chevy Silverado) and began shooting a pistol. There were two other males with him. _____ approached the male to ask about the brass. The male allowed _____ to collect the spent brass. _____ collected .556 and .45 caliber brass. The male introduced himself to _____ as "Brad Bunn". Bunn told _____ about an open carry, 2nd amendment rights event in

SW_00000006

Denver on May 1, 2020. Bunn tried to convince ▮▮▮ to come to the event. Bunn was talking about the event in Denver on May 1, 2020 and stated something like "If they kill us we win. If we kill them we win." ▮▮▮ believed Bunn was a real radical. ▮▮▮ allowed Bunn to believe that he may come to the event to get Bunn's phone number. The number he obtained was 970-699-9047. ▮▮▮ had no further information on the other two males with Bunn.

7.  Per conversation with ATF Agents ▮▮▮▮▮▮▮▮▮, Bunn did not have any firearms registered. According to the ATF, anyone with a fully automatic firearm must have it registered as such.

8.  Another reporting party on April 30, 2020 contacted the Denver Police Department regarding Bunn. This reporting party was ▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮ reported that Bunn has radicalized other individuals and made statements that he has nothing to lose.

9.  ▮▮▮ related that he is friends with a man named Bradley Bunn. They are friends through social media originally but have also met in person to talk about their beliefs. ▮▮▮ indicated he and Bunn are both "Patriots" and have strong beliefs around the 2nd amendment and think that it needs to be defended. ▮▮▮ related that Bunn had been trying to recruit him to come to a rally on Friday, May 1, 2020 at the state capitol in Denver, CO. Bunn told ▮▮▮ that they would wear their ballistic helmets, level IV vests and would engage with firearms if police officers attempted to stop, contact or arrest them. Bunn felt this meant the police were violating their oath to the Constitution and would be committing treason. Bunn had written a manifesto that included the plans and had sent it to ▮▮▮ personally. Bunn's Facebook profile was taken down by Facebook and he was utilizing Chevy McGee and

SW_00000007

"Neo" to send out the message on their Facebook profiles and through a group called "Open Carry Colorado."

10. ▮▮▮ was concerned because he felt that Bunn has possibly an undiagnosed mental illness and feels that Bunn will carry out his plan and that a "civil war" will begin.

11. ▮▮▮ indicated he thinks Bunn wants to be a martyr for their cause and hopes to inspire more followers to participate and come from other states and start the same rally's in other states with the same rule of engagements. ▮▮▮ last information was that they would be meeting in Castle Rock, CO at 750 Cantril St at 10:00am on the May 1, 2020 and then convoy to Denver together. They plan to remove the license plates and not identify themselves to police if contacted. Protestors had mentioned that they would open fire if the police try to stop them. ▮▮▮ mentioned that they would be carrying AR-15's, AK-47's and handguns. ▮▮▮ said he felt as though Bunn wants this to be another "Waco".

12. ▮▮▮ described Bunn's home and how it is set up to prevent police from coming in. He stated that it is barricaded so that the doors cannot be knocked down, that he has pipe bombs and a trench that is 12 feet deep dug around the entire perimeter of the house all with the intent to cause deaths of officers.

13. Detective ▮▮▮ asked ▮▮▮ where Bunn lives. ▮▮▮ only knew that is north possibly in Longmont or Loveland and he had not ever been to his home. He only knew the house was fortified based off the information Bunn shared with him. ▮▮▮ believes that Bunn lives alone, is not married or in a relationship. ▮▮▮ does not know of any children only that he has a service dog. ▮▮▮ feels that Bunn doesn't have anything to lose.

14. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SW_00000008

15. Information received from both reporting parties have been deemed reliable due to reporting parties giving their names and their ties to Bunn. Based on a review of law enforcement databases, neither of the reporting parties have incurred any felony convictions.

16. Concerning the rally, Bunn has allegedly written on Facebook, the following:

17.     "Patriots, our mission this coming Friday, May 1st upon the Capitol steps in Denver is to begin reasserting the fundamental precepts of the Constitution - i.e. freedom and liberty. We will be sending a powerful message to all Patriots, tyrants and tyrannical enforcers everywhere and to those sitting on the fence. The message is this: "Tyrants and your enforcers - regardless of your capricious, draconian laws and edicts, regardless of your threats of imprisonment, regardless of your illicit presumed power to take our lives, our liberty and our ability to pursue happiness we stand in armed defiance of you and we will not yield regardless of the cost even if this means forfeiting our lives. Today, upon these Capitol steps, we affirm and assert that no leader, no law and no enforcer of illicit law will be respected or tolerated who does not first honor the Constitution of the Republic."

18.     Here are our mission parameters:

19.     1) We physically stick together while on site. We're sending an intentional, powerful visual message and this message can't be sent or received if we're dispersed among those who are not there for our purpose. Sticking together also protects us as individuals and it protects the message.

20.     2) ZERO COMPLIANCE. WE WILL NOT YIELD TO ANYTHING REQUIRED BY THE POLICE WHO ARE THE ENFORCERS OF THE TYRANTS IN POWER. We will not give out our drivers licenses so we can be ticketed. We will not be told where to stand or go. We will not surrender our arms and we will not be disarmed. We will not leave until we

SW_00000009

decide to leave. THIS IS OUR CAPITOL and the Constitutional Oath breaking tyrants and enforcers have violated their solemn duty and responsibility to uphold the Constitution. I have personally testified to them, warned them and watched them commit treason within the walls of this Capitol building. This is a government of the people, by the people and for the people and they have no power other than that which WE ALLOW. We are reasserting our power and our voice with the only viable, EFFECTIVE means left to us.

21.  3) No one fires unless physically assaulted or fired upon. All weapons should be chambered and on safe - i.e. hot, locked and ready to rock; however, safeties on and NO fingers in the trigger well unless you intend to fire. Keep a cool head, use sound judgment, watch your backstops and only engage if necessary. Carefully watch your buddies and maintain discipline - things may get tense and we don't need someone losing their cool.

22.  4) Bring a gas mask if you have one or can get your hands on one. The police may use CS gas and for those of us prepared this won't be an effective deterrent. Antifa or other actors may also become a factor because of what we're doing so please bring a can of pepper spray, bear spray or hornet/wasp spray for them. If Antifa or similar distractions become part of the mix do your best to not allow them to detract from the mission.

23.  5) Come prepared to lay down your life. We don't want it to come to this and we've carefully thought through how best to avoid this; however, regardless of our numerical strength or lack of it this message MUST BE SENT NOW, and whether we live or whether we die it MUST BE SENT without compliance or compromise of any kind. Now is the time.

24.  Patriots, this day you will be making history. This is the first time since the Revolutionary War that Patriots will effectively stand as one in armed defiance of tyrants upon the very

SW_00000010

ground which they've usurped freedom and liberty by forbidding you to bear arms in violation of the Constitution.

25.   Bring your weapons, bring your courage and bring your resolve. This day we begin to reclaim our lives, our futures, our freedom and the Republic.

26.   Long Live the Republic

27.   Sentinel"

28. According to law enforcement databases, Bunn has been arrested in the past for domestic violence but was not prosecuted. Bunn also self-reported suicidal thoughts in 2009 to Larimer County Sheriff's Department and was submitted for a mental health evaluation by the Sheriff's office.

29. Bunn served in the Navy from 02/11/1987 to 07/26/1994 and in the Army from 07/27/1994 to 04/25/2010. His character of service during this time was honorable and he received a Combat Action badge for his service in Iraq from 2003-2004. He qualified as expert on the rifle. Bunn owns and operates Sentinel Custom Construction.

30. FBI conducted law enforcement database queries and discovered a current Colorado driver's license issued to BRADLEY W. BUNN, 5512 GABRIEL DR. LOVELAND, CO 80538. BUNN's year of birth is 1966.

31. Based upon this affiant's training, experience, and discussions with other federal agents related to the investigation of National Firearms Act (NFA) violations, this affiant is aware that most firearm owners maintain their firearms in their residences and often in locked safes. Law enforcement have reason to believe that Bunn intends to leave his residence before 8:00 am on May 1, 2020 to attend the aforementioned rally.  Therefore, your affiant has reason to

SW_00000011

believe that Bunn is possessing firearms, including the machinegun seen earlier this week, in his residence.

32. Based upon this affiant's training, experience, and discussions with other federal agents related to the investigation of National Firearms Act (NFA) violations, this affiant is familiar with the following:

    A.  18 U.S.C. § 922(a)(4), which states:  It shall be unlawful for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity.

    B.  18 U.S.C. § 922(o), which states: except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.  The definition of machinegun in the National Firearms Act and the Gun Control Act includes a part or parts that are designed and intended for use in converting a weapon into a machinegun.  This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continue until the finger is released or the ammunition supply is exhausted.

## **CONCLUSION**

33. Based on the investigation described above, probable cause exists to believe that at the residence located at 5512 GABRIEL DR. LOVELAND, CO 80538 as described in

9

Attachment A will be contain evidence, fruits, and instrumentalities of a violation of Title 18,

United States Code, Section 922(o). I therefore, respectfully request that the attached

warrant be issued authorizing the search and seizure of the items listed in Attachment B.

However, this warrant would authorize the seizure, but not the further search, of any

electronic devices

I declare under penalty of perjury that the foregoing is true and correct to the best of my

information, knowledge, and belief.

s/ ▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓ Special Agent

Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this __1st__ day of __May__ 2020

_Michael E. Hegarty_

UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by David Tonini, Assistant United
States Attorney.

SW_00000013

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>5512 Gabriel Dr. Loveland, CO 80538, including all outbuildings thereon and a Red GMC Sierra pickup truck with a Colorado plate OJL228, more fully described in Attachment A, attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 20-sw-00446-NYW |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___State and___ District of ___Colorado___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

     X  evidence of a crime;

     X  contraband, fruits of crime, or other items illegally possessed;

     X  property designed for use, intended for use, or used in committing a crime;

     ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o) | Possession of a Machinegun |
| 26 U.S.C. §§ 5841, 5845, 5861(d), and 5871 | Possessing Unregistered Firearms |

The application is based on these facts:

     X  Continued on the attached affidavit, which is incorporated by reference.

     ☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/*█████████████

*Applicant's signature*

████████  Special Agent, FBI

*Printed name and title*

Sworn to before me and:  ☐ signed in my presence.

                  ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   **01 May 2020**

*Judge's signature*

City and state:   ___Denver, CO___      Nina Y. Wang
United States Magistrate Judge

*Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The Subject Premises is located at 5512 Gabriel Drive, Loveland, Co, 80538. The Subject Premises is more particularly identified as a brick style house with a white exterior trim around the gutters, windows, front door. The garage door is red or maroon in color with white trim and the gutters are white in color. The front of the residence faces to the west. There are two (2) windows on the front of the residence. The west side door to the residence is dark colored and covered by outward opening exterior door with white trim and gold handle. There is concrete pathway from the driveway leading to the front door. Next to the driveway is a white light post partially surrounded by a small white picket fence. There is a red or maroon wood like placard with the number 5512 adjacent and to the right of the front door in between the south window and the garage door. There is a driveway that runs along the west side of the property leading to the garage from the street Gabriel Drive. The residence is surrounded by a wooden 6 foot privacy fence. The fence has an outward opening gate that opens to the south onto Chestnut drive. The location consists of the subject residence, surrounding property, and all outbuildings located thereon. The place to be searched includes all rooms therein, including any safes, storage containers, closets, sheds, and garages associated with the premises additionally the subject's vehicle that registers to him. This vehicle is a 2005 Red GMC Sierra pick up truck with VIN 2GTEK13TX51317517, bearing a Colorado Disabled Veteran plate OJL228.

1

SW_00000015





2

SW_00000016

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items, located within the residence at the Subject Premises, constitute evidence, fruits, proceeds, and instrumentalities of potential violations of Title 18 U.S.C. § 922(o) – Possession of a Machinegun, and 26 U.S.C. §§ 5841, 5845, 5861(d), and 5871- Possessing Unregistered Firearms (Subject Offenses).

1. Any and all evidence related to the manufacture, sale, and/or possession of any firearm, explosive, incendiary or destructive devices, including containers, bottles, tools, hammers, gasses, powders, smokeless powder, tape, matches, flammable liquids, lighters, candles, fuses, pipes, fittings, reducers, glue, or any other items that could be constructed into said devices.

2. Any evidence of the purchase and/or procurement of any explosive, incendiary or destructive devices and any materials and instructions to construct such devices, including receipts, bills of sale, instructions, research, formulary, notes, documents, or other records and items related to the procurement or construction of such devices.

3. Any evidence of planning an attack or event including notes, diaries, manifestos, research (including inquiry about hours of operation, location or layout of malls, stores or other public places), maps or schematics, historical research, photographs, or other evidence related to such plans.

4. Any safe deposit box keys, storage keys or records pertaining to safe deposit boxes or storage units or areas where destructive devices or materials for such devices may be located.

5. Any information identifying associates engaged in distributing or purchasing destructive devices and/or materials and/or the laundering of proceeds related to distribution of destructive devices.

6. Cash, currency, financial instruments, and/or records relating to the laundering, secreting, and/or distribution of monies related to the proceeds of procuring or distributing of destructive devices, and any and all financial documents and records which may evidence financial transactions relating to obtaining, transferring, laundering, secreting or spending the proceeds of the sale of destructive devices.

7. Photographs showing destructive devices or materials and people in possession of such items.

8. Indicia of ownership including registration documents, insurance, bills, mail, lease agreements, bank statements, legal documents, or subscriptions.

9. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the Subject Offenses;

SW_00000017

10. Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications devices, cellular telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the Subject Offenses.

11. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant relating to the Subject Offenses:

    a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

    b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f. evidence of how and when the COMPUTER was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    g. records of or information about Internet Protocol addresses used by the COMPUTER;

    h. information about usernames or any online accounts or email addresses;

    i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    k. contextual information necessary to understand the evidence described in this attachment;

SW_00000018

  l.  volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer;

  m.  any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the Subject Offenses;

  n.  items otherwise described above in paragraphs **1-10** of this Attachment B.

<u>DEFINITIONS:</u>

12.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

13.  As used above, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

SW_00000019

## AFFIDAVIT

I, ▓▓▓▓▓▓▓▓ being duly sworn, state:

## INTRODUCTION AND AGENT BACKROUND

1. Your Affiant is a Special Agent with the United States Federal Bureau of Investigation
   ("FBI") and has been since July 2014. Your Affiant received four months of training in
   criminal investigations and related legal matters at the FBI Training Academy in Quantico,
   Virginia. Upon completion of training at the FBI Training Academy, your Affiant was
   assigned to the San Antonio Division FBI where he primarily investigated white-collar
   crimes, specifically those involving public corruption, as set forth in 18 U.S.C. § 1951, et
   seq., and other related federal criminal violations. In April 2020, your Affiant transferred to
   the Denver Division FBI where he primarily conducts investigations involving national
   security matters. Your Affiant has, through training and experience, become familiar with
   and used all normal methods of investigation, including, but not limited to, visual
   surveillance, interviewing witnesses, subpoenas, search and arrest warrants, confidential
   human sources, consensual monitoring, pen registers, undercover operations, and court
   authorized wiretaps.

2. This affidavit is in support of a search and seizure warrant for 5512 GABRIEL AVENUE,
   LOVELAND, CO 80538 for evidence of violations of Title 18, United States Code, Section
   18 U.S.C. § 922(o) – Possession of a Machinegun, and Title 26, United States Code, Sections
   5841, 5845, 5861(d), and 5871- Possessing Unregistered Firearms (the Subject Offenses).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant,
   I have not included each and every fact known to me concerning this investigation. I have
   set forth facts that I believe are necessary to establish probable cause to believe that evidence,

SW_00000020

fruits, and instrumentalities of violations of the Subject Offenses are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

**PROBABLE CAUSE**

5. On May 1, 2020, this affiant obtained a search warrant for the Subject Premises from the U.S. District Court for the District of Colorado. That search warrant is at Case No. 20-sw-00443-MEH, and that affidavit is incorporated herein.[1] That search warrant authorized the search and seizure of machineguns and related components and tools, among other things.

6. The search warrant is presently being executed. To conduct a protective sweep for officer safety, a bomb robot was utilized and a bomb technician noted a suspicious satchel in a bedroom of the residence. An x-ray was taken of the satchel by the robot. That x-ray indicates the presence of two pipes with external threaded endcaps, appearing to be improvised explosive devices or pipe bombs. Another box in the bedroom with two similar looking devices was found, as well as a bottle labeled "smokeless powder" in a box in the corner of the bedroom. Fusing that may be used as a component of pipe bombs was also seen by the robot in plain view on a table in the residence.

7. Your affiant knows from training and experience, and discussions with other law enforcement officers, that makers of pipe bombs often learn how to make such devices by searching the Internet on computers.

---

1 The Subject Premises includes a 2005 Red GMC Sierra pickup truck with VIN 2GTEK13TX51317517, bearing a Colorado Disabled Veteran plate OJL228, which is the vehicle registered to Bradley Bunn at the Subject Premises.

SW_00000021

8. For these reasons, the affiant seeks expanded authority from the court to search for and seize items including explosives and IED components, electronic devices and writings related to Subject Offenses.

## SEIZURE AND SEARCH OF COMPUTERS

9. As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises, there is probable cause to search and seize those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

10. For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

11. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they

6

can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

12. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.

SW_00000023

Computer file systems can record information about the dates files were created and the sequence in which they were created.

13. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

14. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

15. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit the offenses discussed in this affidavit. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

SW_00000024

16. Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

17. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

18. I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to

9

appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

19. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

20. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data

SW_00000026

recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

21. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    A. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    B. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted),;

    C. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

22. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary

SW_00000027

that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

A. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

B. The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a

12

SW_00000028

computer has been used, what it has been used for, and who has used it

requires considerable time, and taking that much time on premises could be

unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to

thoroughly examine storage media to obtain evidence. Reviewing information

for things described in the warrant can take weeks or months, depending on

the volume of data stored, and would be impractical and invasive to attempt

on-site.

C. Technical requirements. Computers can be configured in several different

ways, featuring a variety of different operating systems, application software,

and configurations. Therefore, searching them sometimes requires tools or

knowledge that might not be present on the search site. The vast array of

computer hardware and software available makes it difficult to know before a

search what tools or knowledge will be required to analyze the system and its

data on-site. However, taking the storage media off-site and reviewing it in a

controlled environment will allow its examination with the proper tools and

knowledge.

D. Variety of forms of electronic media. Records sought under this warrant

could be stored in a variety of storage media formats that may require off-site

reviewing with specialized forensic tools.

E. Need to review evidence over time and to maintain entirety of evidence. Your

Affiant recognizes the prudence requisite in reviewing and preserving in its

original form only such records applicable to the violations of law described

13

in this Affidavit and in Attachment B in order to prevent unnecessary invasion

of privacy and overbroad searches. Your Affiant advises it would be

impractical and infeasible for the Government to review the mirrored images

of digital devices that are copied as a result of a search warrant issued

pursuant to this Application during a single analysis. Your Affiant has

learned through practical experience that various pieces of evidence retrieved

from digital devices in investigations of this sort often have unknown

probative value and linkage to other pieces of evidence in the investigation

until they are considered within the fluid, active, and ongoing investigation of

the whole as it develops. In other words, the weight of each individual piece

of the data fluctuates based upon additional investigative measures

undertaken, other documents under review and incorporation of evidence into

a consolidated whole. Analysis is content-relational, and the importance of

any associated data may grow whenever further analysis is performed. The

full scope and meaning of the whole of the data is lost if each piece is

observed individually, and not in sum. Due to the interrelation and correlation

between pieces of an investigation as that investigation continues, looking at

one piece of information may lose its full evidentiary value if it is related to

another piece of information, yet its complement is not preserved along with

the original. In the past, your Affiant has reviewed activity and data on digital

devices pursuant to search warrants in the course of ongoing criminal

investigations. Your affiant has learned from that experience, as well as other

investigative efforts, that multiple reviews of the data at different times is

14

necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

SW_00000031

24. Because several people may share the Subject Premises as a residence, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

25. I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, your Affiant knows from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

26. I know from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit to include credit card bills, telephone bills, correspondence and other identification documents.

## CONCLUSION

27. Based on the investigation described above, probable cause exists to believe that at the residence located at 5512 GABRIEL DR. LOVELAND, CO 80538 as described in Attachment A will be contain evidence, fruits, and instrumentalities of a violation of the

16

SW_00000032

Subject Offenses. I therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B. However, this warrant would authorize the seizure, but not the further search, of any electronic devices

/

/

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

                                        s/
                                        Special Agent
                        Federal Bureau of Investigation


SUBSCRIBED and SWORN before me this ___1st___ day of ___May___ 2020

_____
UNITED STATES MAGISTRATE JUDGE


Application for search warrant was reviewed and is submitted by David Tonini, Assistant United States Attorney.

SW_00000033