IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00158-CMA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1. BRADLEY BUNN,

        Defendant.

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by undersigned counsel, respectfully submits this Response in Opposition to the Defendant's Motion to Suppress (Doc. 56).

## INTRODUCTION

The Court should deny the Defendant's Motion to Suppress because probable cause supported the search warrant that Magistrate Judge Hegarty authorized. Furthermore, even if Judge Hegarty incorrectly determined that probable cause existed, the FBI acted in objectively reasonable, good-faith reliance on the search warrant, and suppression of evidence seized would not serve the purpose of the exclusionary rule. Thus, on either of these two bases, evidence including the four functional, metal pipe bombs that were found in Defendant's bedroom, and his statement that he intended to use the bombs against police, should not be suppressed.

In his Motion, even though probable cause is assessed by a totality of the circumstances test, Defendant limits his focus to a single paragraph among the 13-page

1

application presented to Judge Hegarty. (Doc. 56 at 2.) Based only on that one paragraph he asserts that probable cause was insufficient. *Id.* He then misstates the evidence from that one paragraph, incorrectly asserting that the search warrant "rests entirely on an unidentified witness's uncorroborated assertion that he heard fully automatic gunfire coming from over the hill." (*Id.* at 5.) Defendant's assertions are without merit. Two parties reported an urgent concern about illegal firearm possession (including explosives) by Defendant. Both were identified. Both also were, to the extent practicable in a compressed timeframe, corroborated and validated. Both were reliable. The Government put forward evidence showing the reasons for that assessment, and Judge Hegarty properly found probable cause to authorize the search. Accordingly, for the reasons set forth below, Defendant's motion should be denied.

## STATEMENT OF THE CASE

**A.     On the Same Day, Two Colorado Citizens Independently Warn the Denver Police Department of an Urgent Concern.**

On April 30, 2020, the Denver Police Department received two calls from concerned citizens needing to report an urgent risk to the community. Neither reporting party was associated with the other. But their message was the same: a man later identified as the Defendant, Bradley Bunn, was in possession of illegal firearms and on the following day, May 1, 2020, he may seek to open fire against police in Denver.

These two citizens were not anonymous, contrary to the Defendant's assertion. They are identified by name in the search warrant affidavit, which is Restricted Exhibit 1 to this response. Their names are restricted in the public record for their safety because of threatening online messages about this case. (Doc. 47 at ¶ 14, Doc. 52.)

2

The first concerned citizen, who is referred to as Reporting Party # 1 (RP1) in this response, told a DPD officer that on the previous Saturday at the Pawnee Grasslands he "heard automatic gunfire coming from over a hill." (Restricted Ex. 1, affidavit ¶ 6.) RP1 said that he is an ammunition reloader, he knows what automatic gunfire sounds like, and he compared its sound to that of a bump stock. *Id.* RP1 said he came around the hill to engage with the person firing the automatic weapon and he found a man, later identified as Defendant, wearing camouflage clothing and a tactical vest. *Id.* RP1 reported that when he came around the hill, Defendant put the suspected automatic weapon, which RP1 described as an AR style rifle, into the back of a truck and began shooting a pistol instead. *Id.* There were two other men with the Defendant, but RP1 only reported seeing the Defendant in possession of firearms. *Id.*

RP1 reported that the man, who introduced himself as "Brad Bunn," was a real radical. *Id.* Defendant tried to convince RP1 to attend an open-carry firearms rally in Denver on May 1, 2020. *Id.* RP1 said that when talking about the event, Defendant said something like, *"If they kill us we win. If we kill them we win." Id.*

The second concerned citizen, Reporting Party # 2 (RP2), called to report that he knows Defendant personally through the militia, they are friends, and RP2 felt that on May 1 Defendant would carry out a plan and that a "civil war" will begin. *Id.* ¶¶ 8-12. RP2 warned that Defendant had radicalized others and made statements that he had nothing to lose. *Id.* RP2 was concerned that Defendant has an undiagnosed mental illness, that he wants to be a martyr, and that the plan was to open fire if police tried to stop those people attending Defendant's event. *Id.* RP2 felt that Defendant wanted the

3

May 1, 2020 event to be another "Waco," which is a reference to the shootout and 51-day siege in 1993 during which four federal agents and 82 civilians were killed. *Id*. He said that Defendant had written a manifesto that included the plans and that he had sent it to RP2 personally. *Id*.

RP2 also described Defendant's home in Northern Colorado. *Id*. ¶¶ 12-13. He said that he had not been there, but that Defendant shared information with him that the house was fortified to prevent police from entering. *Id*. He said that Defendant barricaded his doors so that they cannot be knocked down, had pipe bombs, and dug a trench that is 12 feet deep, all with the intent to cause death to officers. *Id*.

**B.     FBI Agents Corroborate the Reporting Parties.**

With the open-carry firearms rally set to occur the next day, officers immediately evaluated these two reporting parties, seeking to assess their reliability. In just a few hours after receiving the warnings, officers corroborated key facts and determined that the reporting parties were sufficiently reliable for five reasons:

- First, both reporting parties openly identified themselves and described their ties to Defendant and their sources of information. *Id*. ¶ 15. RP1 had personal knowledge of the alleged offense because he heard an automatic weapon and then saw Defendant possessing the rifle. Defendant's own statements were RP2's source of information. "He knew the house was fortified based off the information Bunn shared with him." *Id*. ¶ 13.
- Second, agents reviewed law enforcement databases and concluded that neither reporting party had incurred any felony convictions. *Id*. ¶ 15.

- Third, agents confirmed that RP2 was accurate in his statement that Defendant lives in Northern Colorado, possibly in Longmont or Loveland. *Id.* ¶ 13. In fact, Defendant lives in Loveland. *Id.* ¶ 30.

- Fourth, agents found the manifesto that Defendant allegedly wrote on Facebook, and it was consistent with both reporting parties' warnings. *Id.* ¶¶ 17-27. The manifesto announced the open-carry firearms rally to occur on May 1, 2020 at the Colorado Capitol. *Id.* It embraced a confrontation with police, "ZERO COMPLIANCE. WE WILL NOT YIELD TO ANYTHING REQUIRED BY THE POLICE WHO ARE THE ENFORCERS OF THE TYRANTS IN POWER." *Id.* ¶ 20 (capitalization in original). It promoted martyrdom, "Come prepared to lay down your life." *Id.* ¶ 23. It was signed by the alias, "Sentinel," which is also a trade name owned and operated by Defendant. *Id.* ¶¶ 27, 29.

- Fifth, agents learned that Defendant had a history of mental illness, which corroborated the claim by RP2 that he was concerned that an undiagnosed mental illness might lead Defendant to carry out his plan for violence. *Id.* ¶ 10. In fact, law enforcement databases showed that Defendant self-reported suicidal thoughts in 2009 to the Larimer County Sheriff's Department and was submitted for a mental health evaluation by the Sheriff's office. *Id.* ¶ 28.

Based upon this corroboration and validation of information presented by the two reporting parties, law enforcement officers assessed the information received to be sufficiently reliable to present a search warrant application to Magistrate Judge Hegarty.

C.  **Magistrate Judge Hegarty Authorizes a Search of Defendant's Residence for Illegally Possessed Firearms.**

Having received these explicit warnings, the FBI was compelled to present a search warrant application to Magistrate Judge Hegarty to disrupt the assessed risk. The search warrant application sought evidence related to the illegal possession of a machinegun based upon the personal knowledge averred by RP1.

Agents also confirmed with ATF agents that Bunn did not have a machinegun registered, and that in order to lawfully possess a fully-automatic machinegun, Bunn must have registered it with ATF. *Id.* ¶ 7. The search warrant affiant, who was a five-year veteran of the FBI, also testified based on his training, experience, and conversations with other agents, that most firearms owners maintain their firearms in their residences and often in locked safes. *Id.* ¶ 31. Further, the affiant had reason to believe that Defendant intended to leave his residence before 8:00 AM the next morning for the open-carry firearm rally. *Id.* Therefore, the affiant testified, he believed that evidence of that unlawfully possessed machinegun would be found in Defendant's residence in the morning before the rally.

Magistrate Judge Hegarty found that the affidavit presented probable cause. He authorized a search for evidence, fruits, or instrumentalities of a violation of 18 U.S.C. 922(o), possession of a machinegun, at Defendant's residence.

D.  **FBI Agents Discover Pipe Bombs in the Defendant's Bedroom, and He Tells Agents That He Built the Pipe Bombs to Kill Police.**

The FBI Northern Colorado Joint Terrorism Task Force executed the search warrant at 7:00 AM as Defendant was preparing to attend the rally. A bomb robot was utilized to first conduct a protective sweep for officer safety. The robot operator found a

6

suspicious satchel in Defendant's bedroom. An x-ray was taken of the satchel by the robot, and that x-ray indicated the presence of two improvised explosive devices or pipe bombs. The robot also saw components and precursors for pipe bombs on the kitchen table. On this basis, a second search warrant was sought from and authorized by Magistrate Judge Wang. The second search warrant authorized the search for and seizure of explosives and related materials. (Restricted Ex. 2).

FBI personnel recovered four devices that consisted of a galvanized steel pipe with external threads and an external end cap on each end. One end cap on each device contained a hole through which a fuse had been inserted as an initiating system.

After removing the devices from the residence following standard explosive ordnance disposal procedures, bomb technicians transported the devices to a range where they successfully conducted a render safe procedure on each device. After the devices were rendered safe, bomb technicians conducted a thermal susceptibility test on the filler found inside the pipe of each device. In each of the devices, the filler reacted violently to a flame, indicating it was energetic, or explosive.

The FBI also found that Defendant had barricaded his doors and fortified his home, just as RP2 had said. (*See* Detention Hearing Exhibits 2-5, Doc. 13 at 8-11.) Further, during an interview discussed below, Defendant admitted to engaging in "PSYOPS" which is a military term referring to psychological operations aimed at influencing the enemy's state of mind.[1] Misinformation is a form of PSYOPS. Thus, although there was not a 12-foot deep trench around Defendant's property, RP2's report that Defendant was the source of information about such a trench were implicitly

---

[1] Miriam-Webster online, available at https://www.merriam-webster.com/dictionary/psyops (last viewed September 20, 2020).

validated by Defendant's admission that he deliberately engaged in misinformation. Thus, the only tip that was not ultimately confirmed concerned the location of the machinegun. Several firearms and ammunition also were recovered, but a machinegun was not.

Concurrent to the execution of the search warrant, agents conducted a custodial interview of Defendant in a vehicle parked in front of the residence. Defendant was advised of his rights pursuant to Miranda, and he waived those rights and agreed to speak with agents. Approximately two hours into the interview, an agent told Defendant that the robot operator found what appeared to be pipe bombs. Defendant then confessed to making the pipe bombs with a mixture of black powder and gunpowder. He said that the fuses were intended to be lit with a lighter and provide a "five to seven second fuse like a grenade."

When asked what he planned to do with the bombs, Defendant replied, "If I experienced a hard entry, at 3 am, having been an infantry commander, it's really tough to get guys to spread out no matter how hard you try. They still want to clump up 'cause of fear, and I know they're there anyway[.]" The agent clarified, "So a hard entry in the morning, you were going to use them on a bunch of clumped up guys out front?" Bunn answered, "Fuck yes." In other words, the pipe bombs were made to kill police.

**ARGUMENT**

A.  **The Search Warrant Was Supported By Probable Cause.**

When presented with a search warrant application "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of

8

knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 223 (1983). After-the-fact scrutiny by reviewing courts of sufficiency in an affidavit "should not take the form of *de novo* review." *Id.* at 236. This is because "a magistrate's determination of probable cause should be paid great deference by reviewing courts." *Id.* (citing *Spinelli v. United States*, 393 U.S. 410 (1969)). Thus, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for * * * conclud[ing]' that probable cause existed.'" *Gates*, 462 U.S. at 223 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

Indeed, perhaps the central teaching of decisions bearing on the probable cause standard is that it is a "practical, nontechnical conception." *Gates*, 462 U.S. at 231 (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). "In dealing with probable cause, * * * as the very name implies, [courts] deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* When assessing the totality of the circumstances to determine probable cause, veracity, reliability, and basis of knowledge are "closely intertwined issues that may usefully illuminate the commonsense, practical questions whether there is probable cause to believe that contraband or evidence is located in a particular place." *Id.* at 230.

The facts of this case presented to Magistrate Judge Hegarty satisfied the probable cause standard because they set forth in practical considerations of everyday life the probability that an illegal firearm would be located in the particular place to be

9

searched. Contrary to the assertions in Defendant's Motion, more than a single paragraph set forth facts that contributed to the finding of probable cause. Rather, the affidavit presented 13 pages of information from two reporting parties and subsequent FBI corroboration. Those pages that Defendant overlooks established appropriate foundations to evaluate the veracity, reliability, and basis of knowledge for both identified reporting parties, one of whom observed first-hand by sight and sound the alleged contraband in Defendant's possession days before the search. Such first-hand observation entitles RP1's tip to greater weight. *Gates*, 462 U.S. at 234. And, even assuming *arguendo* that this basis of knowledge was somehow deficient, RP1's willingness to come forward by name with a report of criminal activity – which if fabricated would subject him to criminal liability- overcomes even rigorous scrutiny. *Id.*

In his Motion, Defendant argues that *United States v. Loera*, 923 F.3d 907 (10th Cir. 2019) provides him a basis for suppression. (Doc. 56 at 4.) In that case, after *tainted information* was excised, the remaining information was insufficient to allow a magistrate judge to determine probable cause. (Doc. 56 at 4.) *Loera*, which involved the incorporation of illegally-obtained information into a search warrant affidavit, is inapposite because this case does not concern any illegally-obtained information. Defendant does not suggest that information obtained by FBI from RP1 and RP2 was improperly obtained, nor does Defendant assert that the FBI violated his rights by corroborating the information and validating RP1 and RP2's reliability.

Furthermore, *Leora* does not stand for the proposition that a magistrate judge must perceive "the sounds that the unnamed (sic) informant heard" in order to

independently assess if he heard a machinegun. (Doc. 56 at 5.) *Leora* was a child pornography case, and the simple concept of automatic gunfire sound is distinguishable from the complex definition required to assess child pornography. *See* 18 U.S.C. § 2256(8); *United States v. Wolf*, 890 F.2d 241, 244 (10th Cir. 1989) (explaining the six *Dost* factors for determining whether an image involves the lascivious exhibition of the genitals). Given that legal complexity, a magistrate judge may need more information to determine if there is a fair probability that a picture is contraband. The same is not true of automatic gunfire. Nevertheless, RP1 confirmed his knowledge of that sound, likened it to the sound of bump stock, and provided that he is an ammunition reloader who spent his time on a Saturday in an area designated for shooting firearms. (Ex. 1 ¶ 6.) Judge Hegarty and the agents made the reasonable inference that RP1's basis for identifying the sound of automatic gunfire was reliable. Considering the totality of the circumstances – specifically, the information provided by both RP1 and RP2, and the information corroborated by the FBI – such information is sufficient to establish probable cause. *See*, *e.g.*, *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1259 (10th Cir. 2008) (the statement in an affidavit that an officer "has experience detecting the odor of marijuana" provided a sufficient credential to allow the witness's perception to establish probable cause).

For these reasons, Judge Hegarty's determination of probable cause should be paid great deference and the affidavit (Ex. 1) provided him with a substantial basis for concluding that probable cause existed. Therefore, the Motion should be denied.

**B.     The FBI Agents Acted In Objectively Reasonable, Good-Faith Reliance On The Search Warrant.**

Suppression is a remedy of last resort, to be used for the *sole purpose* of deterring future Fourth Amendment violations, and only when the deterrence benefits of suppression outweigh its heavy costs. *Davis v. United States*, 564 U.S. 229, 236-37 (2011); *Herring v. United States*, 555 U.S. 135, 140-41 (2009). "The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring*, 555 U.S. at 141. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144.

These principles are reflected in the good-faith exception to the exclusionary rule articulated in *Leon*: when police act in "objectively reasonable reliance on a subsequently invalidated search warrant" obtained from a neutral and detached magistrate, "the marginal or nonexistent benefits produced by suppressing evidence * * * cannot justify the substantial costs of exclusion." 468 U.S. at 922. The good-faith exception thus recognizes that "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope * * * there is no police illegality and thus nothing to deter." *Id.* at 920-21.

The facts of this case fall comfortably within this body of law and mandate the application of the good-faith exception. Assuming arguendo that the probable cause found by Judge Hegarty was deficient, suppression is not appropriate because the agents reasonably relied on the subsequently invalidated warrant and were not culpable for the magistrate judge's purported error. *See Davis*, 564 U.S. at 240 ("in 27 years of

12

practice under Leon's good-faith exception, we have never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct"). The Supreme Court has consistently expressed a "strong preference for warrants" and mandated "great deference" to a magistrate's determination that a warrant is constitutionally sufficient. *Leon*, 468 U.S. at 914. "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012).

Moreover, the Supreme Court has repeatedly emphasized that "[p]enalizing the officer for the magistrate's error" in assessing compliance with the Fourth Amendment's probable cause requirement "cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon*, 468 U.S. at 921; *see Herring*, 555 U.S. at 142 ("[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted in objectively reasonable reliance on the subsequently invalidated search warrant"). "Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law * * * ." *Leon*, 468 U.S. at 921; *United States v. Gonzalez*, 399 F.3d 1225, 1229-30 (10th Cir. 2005) ("officers are generally not required to second-guess the magistrate's decision in granting a warrant"). The Supreme Court recently reaffirmed that principle, holding that it is not objectively unreasonable for a police officer to rely on a magistrate judge's mistaken assessment of probable cause. *Utah v. Strieff*, 136 S. Ct. 2056, 2064 (2016).

13

Nothing presented in Defendant's Motion to Suppress suggests that a different result is merited in this case. Accordingly, Defendant's Motion should be denied.

## CONCLUSION

For these reasons, the Court should deny the Defendant's Motion to Suppress.

Dated this 24th day of September, 2020.

                                   JASON R. DUNN
                                   United States Attorney

                                   *s/ David Tonini*
                                   Assistant United States Attorney
                                   United States Attorney's Office
                                   1801 California St, Suite 1600
                                   Denver, Colorado 80202
                                   Telephone: 303-454-0100
                                   Fax: 303-454-0401
                                   Email: David.Tonini@usdoj.gov

                                   Attorneys for the Government

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 24th day of September, 2020, I electronically filed the foregoing **RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS** Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Matt Golla

                                       *s/ David Tonini*
                                       By: David Tonini
                                       Assistant U.S. Attorney