## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00158-CMA

**UNITED STATES OF AMERICA,**

      Plaintiff,

**v**.

**1.**     **BRADLEY BUNN,**

      Defendant.

---

## DEFENDANT BRADLEY BUNN'S SENTENCING STATEMENT
## AND MOTION FOR VARIANCE OR NON-GUIDELINE SENTENCE

---

      Defendant, Bradley Bunn, by and through his counsel, Lisa A. Polansky, Attorney at Law, hereby submits this Sentencing Statement and Motion for Variance or Non-Guideline Sentence to this Honorable Court for consideration.

      Mr. Bunn comes before this Court for sentencing following his pleas of guilty to all counts in the Complaint, his first ever felony convictions.  On March 4, 2021, Mr. Bunn plead guilty to all of the Counts alleged in the Indictment, to include: **Count 1**, Making Firearms in Violation of the National Firearms Act – Destructive Device, in violation of 26 U.S.C. §§ 5861(f), 5871; and **Counts 2 through 5**, Possessing an Unregistered Firearm – Destructive Device, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.

      In this case, and in light of all of the attendant circumstances as described herein, this Court should exercise its discretion in crafting a reasonable sentence which meets the goals of 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary.  Specifically,

Mr. Bunn requests a sentence of time served, as of October 13, 2021, for approximately seventeen (17) months of incarceration, followed by an appropriate term of Supervised Release.

## I.   PRELIMINARY STATEMENT

This Court is very familiar with its legal authority to impose a variant sentence.  This Court must consider the Guidelines ranges but is specifically permitted to tailor the sentence in light of other statutory concerns. *See United States v. Booker*, 543 U.S. 220, 245-246 (2005) and 18 U.S.C. §3553.

Unquestionably, this Court is empowered to consider *all* of the characteristics of the offender and circumstances of the offense and to impose a sentence that is not greater than necessary to satisfy the statutory purposes of sentencing.  *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Booker*, 543 U.S.at 220).

Sentencing judges are now invited to consider arguments that the Guidelines fail to properly reflect § 3553(a) considerations, reflect unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate. *Rita*, 551 U.S. at 351, 357.  Further, Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101 (internal quotation marks omitted).

## II.   APPLICABLE LAW

The Tenth Circuit has described the sentencing process and the relationship between the Sentencing Guidelines and § 3553 as a three-step process where the sentencing judge:  (1) calculates the applicable guideline range; (2) "(o)nce the applicable

range is determined, the court should then decide if a traditional departure is appropriate under…the Federal Sentencing Guidelines"; and (3) once "the guidelines sentence is determined, the court shall consider all other factors set forth in § 3553(a) to determine whether to impose the sentence under the guidelines or a non-guidelines sentence." *United States v. A.B.*, 529 F.3d 1275, 1286 n.14 (10th Cir. 2008); *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1216 n.3 (10th Cir. 2008) (quoting *United States v. Haack*, 403 F.3d 997, 1003 (8th Cir. 2005)).

### III.    BACKGROUND

On May 1, 2020, law enforcement agents executed a Search Warrant at the home of Bradley Bunn, a then-fifty-three-year-old military veteran, who at that time, resided in Loveland, Colorado.  Law enforcement had information that Mr. Bunn intended to attend an open-carry rally at the Capitol in Denver later that day.  Upon the arrival of law enforcement, Mr. Bunn was found loading some items into a truck.

Law enforcement ultimately discovered and seized four destructive devices from Mr. Bunn's home.  Mr. Bunn was arrested and transported to the Larimer County Jail.  Mr. Bunn was then transferred into the custody of the Federal Marshals Service.  This federal criminal case followed.

Upon questioning by law enforcement agents during his transport from the jail to the custody of the Marshals, Mr. Bunn described his deep loyalty to the United States, as a former military officer who took an oath to defend the Nation's Constitution.  Mr. Bunn feared being unlawfully stripped of his right to bear arms, something he believed would be treasonous and violate his constitutional rights. Mr. Bunn was cooperative, even thanking the officers for the professionalism and respect with which they had treated him.

Mr. Bunn ultimately plead guilty to all five counts of the Indictment filed against him.

## IV.    ADVISORY GUIDELINES

As the Presentence Investigation Report (hereinafter, "PSIR") filed herein on May 21, 2021, at ECF Doc. #86, indicates, Mr. Bunn will have a total of **530** days presentence confinement credit as of October 13, 2021, **over 17 months** of actual confinement.

As further outlined in the PSIR, Mr. Bunn has one prior misdemeanor conviction from 2014, and as such, his Criminal History Category is **I**. PSIR, ¶¶ 44, 45.

The Federal Guideline calculations are set forth in the Plea Agreement submitted to the Court herein and the PSIR outlines them to an extent.   Based on the charges, the initial base offense level is **18**; then there is a 2-level increase pursuant to §2K2.1(b)(1) due to there being 3-7 "firearms"; resulting in an adjusted offense level of **20**; and there is then a 2-level increase pursuant to §2K2.1(b)(3)(B) because the "firearm" was a "destructive device" resulting in an adjusted offense Level of **21**.    With the application of both a 2-level and 1-level decrease for "Acceptance of Responsibility" pursuant to §3E1.1(b), **the total adjusted offense level is then 18**.

With a Criminal History Category of **I**, this results in an advisory guideline range of **30 to 37 months of** imprisonment for Mr. Bunn.  Nevertheless, the United States Probation Officer opines that an upward departure is warranted under the Policy Statement in §5K2.14, which states that: "If national security, public health, or safety was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense."   Probation then recommends that the Court impose a variant sentence of **48 months** as to each count, to be served concurrently.   As outlined in Mr. Bunn's Objections to the PSIR, filed herein at ECF Doc. # 84, the Policy Statement as to "Public Welfare" set

forth in §5K2.14 is inapplicable.   Mr. Bunn further sets forth therein, contrary to the recommendation of the United States Probation Officer, that a *downward departure* based on his exceptional military service should apply pursuant to Policy Statement in §5H1.11.

## V.    SENTENCING OPTIONS

The statutory maximum term of imprisonment authorized for Count 1 is 10 years.  26 U.S.C. §§ 5861(f), 5871.   The maximum term of imprisonment authorized for Counts 2 through 5 is 10 years. 26 U.S.C. §§ 5841; 5861(d); 5871.

Pursuant to 18 U.S.C. §3583, a term of supervised release of not more than 3 years is also authorized.    Per the Guidelines, Mr. Bunn would not be eligible for a sentence to probation, but probation is not statutorily precluded, and the term authorized is from 1 to 5 years.  18 U.S.C. §3561(a)(1)-(3); (c)(1).

As set forth in the Plea Agreement, the Government will be seeking a sentence within the Guidelines range of **30-37 months**.

## VI.    TRADITIONAL DEPARTURES

A.    U.S.S.C. §5H1.11

As set forth in Mr. Bunn's Objections to the PSIR filed herein at ECF Doc. # 84, the traditional departure set forth in §5H1.11 should be applied to Mr. Bunn. This provision states: "Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."

"In considering the relevance of military service to sentencing, courts are confronted with many issues. The length, nature, context, and experience of military service can vary

5

widely.  One defendant may have served entirely within the United States, perhaps in an administrative post similar to that of a civilian employee, while another may have served under harsh and dangerous combat conditions abroad.  Or, a veteran-defendant may have developed a mental or physical condition while serving in the military, and that condition may have been the result of the military experience and may have contributed to commission of the crime.  Courts have weighed and will continue to weigh various factors in any given case against the goals of sentencing." *See* U.S.S.C., Case Annotations and Resources, Military Service, USSG §5H1.11 Departures and *Booker* Variances, January 2012 (emphasis added).

Both the scientific community and courts recognize the importance of considering the particular characteristics of the defendant, the details of his military service, and the need for rehabilitation in promoting reasonable sentences and treating veterans for service-related disabilities.  Due to advancements in modern medicine and technological developments in military equipment which do more to protect the body, more soldiers physically survive the horrors of war; in the twenty-first century "the body will survive injuries that nearly destroy the brain and, thus the functionality of the person."[1]  As discussed further herein, during his tenure of military service which spanned nearly two decades, Mr. Bunn was trained in special combat skills and learned hyper-vigilance out of necessity. He acquired a severe service-related disability, Post-Traumatic Stress Disorder ("PTSD") as a result of his active-duty military service, as well as head injury and hearing loss. As Psychologist and Lieutenant Colonel Dave Grossman has opined, "[b]ecause military

---

[1] Chrisanne Gordon, M.D. & Ronald Glasser, M.D., Traumatic Brain Injury – The Invisible Injury, In THE ATTORNEY'S GUIDE TO DEFENDING VETERANS IN CRIMINAL COURT 201 (Brockton D. Hunter, Esq., & Ryan C. Else, Esq., eds., 2014)

personnel have been conditioned to kill, desensitized to the act of killing, and taught to deny that they have in fact killed, combat veterans who suffer from judgment altering conditions as a result of their service are less culpable for their actions." Dave Grossman, *On Killing: The Psychological Cost of Learning to Kill in War and Society* (1995), Simply put, "[t]o deny the frequent connection between combat trauma and subsequent criminal behavior is to deny one of the direct societal costs of war and to discard another generation of troubled heroes." Deborah Sontag & Lizette Alvarez, Editorial, *Across America, Deadly Echoes of Foreign Battles,* N.Y. Times, Jan. 13, 2006.

In recognition of such principles, courts regularly depart under §5H1.11, or related provisions, or under the § 3553(a) factors, in consideration of military service. *See United States v. Jager*, 2011 U.S. Dist 21203 (D. N. Mex. Feb. 17, 2011) (in a child pornography possession case, while the district court denied a downward departure under the §5H1.11 guideline finding that, in spite of the defendant's outstanding military record, his case did not fall outside the heartland of other similar pornography cases, the court did consider defendant Jager's military service and granted a downward variance based on § 3553(a) factors.); *United States v. Townley*, 472 F.3d 1267 (10th Cir. 2007) (a middle-of-the-advisory-range sentence of 240 months for drug-trafficking offenses was not unreasonable where the district court considered, among other things, defendant's military service.); *United States v. Chapman*, 209 Fed. Appx. 3 (1st Cir. 2006) (40-month sentence, a reduction from the guideline range of 70-87 months, for illegal reentry offense was not unreasonable where the district court considered, among other things, defendant's military service.); *United States v. Risse*, 83 F.3d 212 (8th Cir. 1996) (In a case involving drug trafficking and weapons possession, the court upheld a downward departure from a range

of 57-71 months to 18 months under §5K2.13 (Diminished Capacity), based on the defendant's PTSD connected to serving in Vietnam.); *United States v. Cantu*, 12 F.3d 1506 (9th Cir. 1993) (PTSD supported a downward departure under §5K2.13 in a felon in possession case. The defendant had served for two years in Vietnam and suffered from a "grave affliction" including flashbacks and anxiety. The district court erred in concluding it could *not* depart.)

The exemplary nature of Mr. Bunn's military service, his heroic combat service, his war-time decorations, awards, his rank of Officer achieved, and the physical and mental impact and disability suffered as a result of his combat service and the connection it bears to the crimes of conviction support the imposition of this downward departure. The circumstances of Mr. Bunn's service and how his resulting debilitating mental conditions contributed to the offenses herein are further described herein.

B.    U.S.S.C. §5K2.14

As previously discussed herein, the United States Probation officer recommends the application of §5K2.14, a Policy Statement which provides that "If national security, public health, or safety was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense."   In general, to depart from the guidelines, the Court must "find[] that there exists an aggravating or mitigating circumstance of a kind, or to a degree, **not adequately taken into consideration by the Sentencing Commission in formulating the guidelines** …" §5K2.0(a)(1)(A)[Emphasis added.]    Conversely, sentencing courts have no authority to depart from the sentencing guidelines on the basis of circumstances which are adequately taken into consideration by the Sentencing Commission. *United States v. Smith*, 930 F.2d 1450, 1453 (10th Cir. 1991).

As stated in the Objections to the PSIR, the conduct to which Mr. Bunn has plead guilty is clearly congruent with and contemplated by the statutes which proscribed that conduct, and as such, the application of this upward departure would be inappropriate in this case. *See* §5K2.0(a)(1)(A).  Mr. Bunn plead guilty to one count of Making Firearms in Violation of the National Firearms Act- Destructive Device, and four counts of Possessing an Unregistered Firearm-Destructive Device.   Inasmuch as Mr. Bunn's offenses of conviction involves destructive devices, he received both the base offense level from the subsection applicable to a firearm listed in 26 U.S.C. § 5845(a), *and* the applicable enhancement under subsection (b)(3) of §2K2.1, because "[s]uch devices pose a considerably greater risk to the public welfare than other National Firearms Act weapons." ECF Doc. # 86, at ¶ 31; §2K2.1, comment (n. 7).

It is clear, then, that the greater risk presented by destructive devices, as compared to National Firearms Act weapons, is contemplated by, and addressed by subsection (b)(3) of §2K2.1. In other words, the Guidelines consider and account for the difference between a conviction based on the possession of firearms and a conviction based on the possession of destructive devices. The enhancement found in §2K2.1(b)(3)(B) clearly contemplates and addresses the greater danger posed by the possession of destructive devices versus the possession of firearms; there are no grounds for an additional upward departure.

Comment n.7 to §2K2.1 further states that departures *may* be warranted "[i]n a case in which the cumulative result of the increased base offense level and the enhancement under subsection (b)(3) **does not adequately capture** the seriousness of the offense because of the type of destructive device involved, the risk to the public welfare, or the risk of death or serious bodily injury that the destructive device created…"  [Emphasis added.]

Offenses relating to destructive devices "… involve different degrees of risk to the public welfare depending on the type of destructive device involved and the location or manner in which that destructive device was possessed or transported.  For example, a pipe bomb in a populated train station creates a substantially greater risk to the public welfare, and a substantially greater risk of death or serious bodily injury, than an incendiary device in an isolated area." §2K2.1, comment. (n. 7).   The comment is instructive and under the circumstances presented by this case, no further departure is warranted. Nobody was injured—much less killed—as a result of Mr. Bunn's simple possession of destructive devices in his home. Mr. Bunn did not transport these destructive devices at all, much less to a populated area. Mr. Bunn did not threaten to or announce any intention to transport these destructive devices to a populated area. The comparison of Mr. Bunn's possession of destructive devices in his home to instances where an individual brought such devices to a heavily populated area is not apt. *See United States v. Dye*, No. CR 19-1819 JB, 2020 U.S. Dist. 232, at *20 (D.N.M. Jan. 2, 2020) (Enhancement under §2K2.1(b)(3)(B) applied where defendant possessed between fifty-five and eighty stolen firearms and a grenade in his home; no public safety departure under §5K2.14 applied);  *cf. United States v. Stumpf*, 938 F.2d 172, 174 (10th Cir. 1991) (Upward departure pursuant to §5K2.14 affirmed where defendant's possession of ten pipe bombs, lack of remorse, prior felony criminal history wherein he was afforded leniency due to his youth, and association in a leadership role with paramilitary group factored into court's justification.   Court specifically noted that defendant's sale of weapons endangered community.); *United States v. Michael*, 894 F.2d 1457, 1459 (5th Cir. 1990) (Application of public safety departure under §5K2.14 upheld where the defendant was proven to have experimented with bomb-making for several

years, had previously made two additional bombs for which he was not charged in the instant offense, and had actually placed a bomb underneath a coworker's car. "The latter act was found to show a disregard for human beings or property and an intent to bring about harm or damage to individuals, life, or property.")

On September 22, 2021, the Government filed a Document entitled "Government's Resspose to Defednant's Objections to the Presentence Investigation Report" ECF Doc. #90.  This type of filing is in violation of the Federal Rules of Criminal Procedure and a Motion to Strike is filed concurrently herewith.  Should the Court address the merits of these additional objections after the Government had not filed any objections to the PSIR, then it is important to further distinguish a case cited therein. Specifically, the Government cites a Tenth Circuit case, *United States v. Stumpf,* to stand for the proposition that the Court *may* depart upward pursuant to U.S.S.G. § 5K2.14— in that case, the defendant possessed ten pipe bombs. 938 F.2d 172, 174 (10th Cir. 1991). There, Mr. Stumpf, along with a co-defendant, was indicted on one count of possession of firearms after having previously been convicted of a felony, and ten counts of possession of a destructive device, as well as aiding and abetting. *Id.* at 173.  The factual circumstances of that case, relied upon by the Government to justify the imposition of an upward departure here, are thoroughly distinguishable from the facts at hand and ultimately, the analysis weighs in the other direction.   The court's justifications for an upward departure there went far beyond the application of the Public Welfare departure, finding that:

> (1) Mr. Stumpf was very involved in and sophisticated about the acquisition and building of weapons of the "anti-personnel variety"
> (2) Mr. Stumpf had previously received lenient treatment for serious offenses because of his youth
> (3) Mr. Stumpf apparently lacked recognition of the gravity of his

> previous offenses, and seemed unable to learn from experience…
>
> (4) Mr. Stumpf professed to accept responsibility for his actions and received the appropriate reduction in his offense level, but the court felt that his testimony indicated that he continued to blame others for his criminal behavior and was therefore likely to continue such behavior
>
> (5) Mr. Stumpf's activities posed a threat to public safety
>
> (6) Mr. Stumpf believed that he was selling weapons for use by an illegal paramilitary organization…and Mr. Stumpf had exercised a leadership role in the scheme…

*United States v. Stumpf*, 938 F.2d 172, 173-74 (10th Cir. 1991)

The Policy Statement found in § 5K2.14, and the conclusion that Stumpf's activities threatened the public, was one among six discrete reasons for the application of an upward departure, and the other five justifications found there are not present in this case. Mr. Bunn lacks a criminal history or any formal association with an illegal organization, has taken sincere responsibility for his conduct, and has never been alleged to have sold or distributed weapons.  It is especially crucial that Mr. Bunn has never been accused of selling weapons, as there "[s]pecifically, … <u>the court felt that Mr. Stumpf was a threat to public safety because he had collected and **sold**</u> anti-personnel weapons and was building highly volatile bombs in a residential area without regard to the safety of others." *Id.* at 174 (emphasis added).

As the facts in this case involve mere possession and not an allegation of weapons being sold or distributed, the facts in this case are more like those where courts have rejected upward departures under §5K2.14 in firearm cases.  Additionally, the Government simply concludes, without support in the record, that "The prior detonation of one pipe bomb combined with possession of four destructive devices takes the defendant's case "out of the Guidelines heartland."  ECF Doc. #90, p 3.  The record is entirely devoid of any indication that Mr. Bunn previously detonated a pipe bomb.

In a Third Circuit case, the reviewing court explicitly stated that, where the sentencing court departed upward based on the number of firearms, the unlawful intent behind their use, and the fact that the firearms were untraceable, that: "[b]ecause the Guidelines clearly contemplate the very activities charged in these cases, the departure was not lawful." *United States v. Uca*, 867 F.2d 783, 790 (3d Cir. 1989). The same is true here— §2K2.1(b)(3)(B) explicitly accounts for the simple possession of destructive devices. "Public safety represents a prime consideration whenever restrictions are placed on guns. If any doubt about this existed, the fact that the Guidelines governing firearms violations are included in a part entitled 'Offenses Involving Public Safety' removes that doubt. Inasmuch as the applicable Guideline does take public welfare into consideration, this Court must ask whether danger to the public arising from the facts of this case was 'present to a degree substantially in excess of that which ordinarily is involved in the offense of conviction.'" *Uca*, 867 F.2d 783 at 790. Obviously, "[t]he danger from a pipe bomb comes not from the offense of possession, but from the added factor of use of the pipe bomb." *United States v. Hull*, 456 F.3d 133, 139 (3d Cir. 2006) (determining that the District Court erred in holding that possession of a pipe bomb, on its own, legally constituted a federal crime of violence).

To apply the enhancement in a case where the evidence reflects the mere possession of a destruction device contravenes the intent of the Policy Statement: the risk posed by Mr. Bunn's possession of destructive devices is the very same risk contemplated by the sentencing guidelines in crafting the §2K2.1(b)(3)(B) enhancement to the base offense level. As the Court must find that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the

Sentencing Commission in formulating the guidelines in order to depart from those guidelines, the application of §5K2.14 in this instance is inapposite. §5K2.0(a)(1)(A). Accordingly, an upward departure under §5K2.14 should not be applied in this instance.

## VII.   APPLICATION OF § 3553(a) FACTORS TO MR. BUNN

Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is **sufficient but not greater than necessary** to achieve the purposes indicated in 18 U.S.C. § 3553(a)(2) after considering: (i) the offense's nature and circumstances and the defendant's history and characteristics; (ii) the kinds of sentences available under 18 U.S.C. § 3553(a)(3); (iii) the guidelines and policy statements issued by the Sentencing Commission, including the now advisory guideline range; (iv) the need to avoid unwarranted sentencing disparity among defendants with similar records that have been found guilty of similar conduct; and (v) the need to provide restitution to any victims of the offense.

In imposing a sentence that is sufficient but not greater than necessary, the Court must comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2): (i) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense—retribution; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant—incapacitation; and (iv) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A district court's sentencing decision and decision whether to impose a non-guideline sentence is reviewed for abuse of discretion. *Gall*, 552 U.S. at 51.  Section 3553(a)(1) is recognized as a "broad command to consider the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* at 50 n.6 (internal quotations and

citations omitted). As such, the Supreme Court has stated: "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 52 (internal quotations omitted).

District courts may vary from the Guidelines on policy grounds. The Supreme Court expressly recognized this authority in *Kimbrough v. United States*, where it held that "district courts are free to deviate from the Guidelines based on disagreements with the crack/powder ratio." *Kimbrough,* 552 U.S. 85 at 106-107. The Court went on to clarify in a later case, *Spears v. United States*, that a guideline may be rejected on a categorical basis "and not simply based on an individualized determination that [it] yield[s] an excessive sentence in a particular case." 555 U.S. 261, 264, (2009) (per curiam), citing *Kimbrough,* 552 U.S. 85 at 90. There, in the context of discussing sentencing ratios based on quantities of crack cocaine, the Supreme Court concluded that the district courts below need not justify a departure from the sentencing guidelines because the guidelines would yield an unfair result under the particular circumstances, but may reject the application of a guideline entirely, based on a policy disagreement with that guideline. *Id.*, *citing Kimbrough*, 552 U.S. 85, 101 (2007).

Appellate courts will uphold "even substantial variances when the district court properly weighs the § 3553(a) factors and offers valid reasons for the chosen sentence." *United States v. Barnes*, 890 F.3d 910, 916 (10th Cir. 2018). District courts "can and should engage in a holistic inquiry of the § 3553(a) factors." *Id.* (citation and quotations omitted). A district court has discretion to depart from the Guidelines and impose even a substantial

downward variance where it "bases its decision on specific, articulable facts supporting the variance" and considers the § 3553(a) factors, while imposing a "sentence sufficient, but not greater than necessary, to comply with all of the purposes of sentencing." *Id.* (citations and quotations omitted).

18 U.S.C. § 3551 provides, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." District courts must make an *individualized sentencing decision*; hence, the "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quotation and citation omitted).

The Supreme Court's decisions in *Pepper*, *Booker*, *Gall*, and *Kimbrough* have all "empowered district courts, not appellate courts . . . [and have] breathe[d] life into the authority of district court judges to engage in individualized sentencing." *United States. v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008).

Other statutory sections also give the courts direction in sentencing. Under 18 U.S.C. § 3582, the imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the § 3553(a) factors, the district court is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."

"[S]entencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012). As such, the district court must apply the statutory factors in a "holistic fashion" but need

not "rely on every single factor," as "no algorithm exists that instructs the district judge how to combine the factors or what weight to put on each one."   *Barnes*, 890 F.3d at 916.

In the context of the foregoing statutory provisions and case law, Mr. Bunn respectfully requests this Honorable Court to consider the following information pertinent to the § 3553(a) factors in crafting an appropriate sentence:

In this case, on May 1, 2020, when Mr. Bunn was arrested and his house was searched, it was known that he had planned to attend an open carry rally at the Colorado Capitol Building.  However, the four pipe bombs that were seized at his house did not detonate and no one was injured.  Importantly, while Mr. Bunn was observed loading items into his truck the morning of the search and arrest, he was ***not*** *loading the pipe bombs into his truck*.  As stated in the PSIR (ECF Doc. #86-1 at R-3, Exhibit A), these destructive devices "were never placed within the community."  While the United States Probation Officer writes in the PSIR: "it is not clear if he intended to take the devices to the Denver rally," *id.*, the facts of the case along with Mr. Bunn's own statements, indicate that he did **not** intend to take the pipe bombs out of his home and instead saw them as part of his fortification of his home in his delusional perception of the imminent threat to his security and safety.

In retrospect, Mr. Bunn certainly recognizes the harm that could have resulted from his actions.  As noted in the PSIR, he told his therapist at the GEO Detention Center: "Thank God I did not hurt anyone. I was of the mindset to kill agents that came to my home believing they were knowingly violating the constitution I took an oath to protect. I have to think they may just be following orders, the damage I could have done to their families. Then I thought about the guy I had to kill in Iraq. I bet if we talked, we would find more in common than

different. Those officers coming through my door, they are my brothers, I am so glad I did not hurt anyone because the path I was going down I would have."  PSIR, ECF Doc. #83, at ¶ 76.

Mr. Bunn echoed these sentiments during his meetings with Dr. Doris Gundersen, M.D. (See Evaluation of Bradley Bunn, attached hereto, and incorporated herein by reference as Exhibit A).  Mr. Bunn advised Dr. Gundersen that, while he did not intend to bring the pipe bombs to the Capitol, nor did he have any intent or plan to use any force while at the Capitol, he remained grateful that no one was hurt.  He stated: "I was in a bad place when all of this happened. (Being incarcerated) has given me the opportunity to spin down from that bad place." (Exhibit A, p 3).

Although no one was injured and Mr. Bunn did not intend to bring the destructive devices to the Capitol, the offense itself is obviously quite serious and concerning and Mr. Bunn himself recognizes the harm that could have resulted from his actions.  He has taken responsibility by pleading guilty to every charge in the Indictment.  His actions in the instant offense must be viewed in context of his history and characteristics, 18 U.S.C. § 3553(a)(1), specifically: his military service, his post-traumatic stress disorder (PTSD), and his other interrelated mental and emotional conditions.

Specific offender characteristics should be taken into account when determining the length and type of sentence. Even without applying the §5H1.11 departure for exceptional military service, the Court may grant a downward variance in recognition of the defendant's military service in the context of considering one's history and circumstances under the §3553(a) factors.  "Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines ...." *Porter v.*

*McCollum*, 558 U.S. 30, 43, (2009).  In the landmark case, *Kimbrough v. United States*, 552 U.S. 85 (2007), the imposition of a below-guideline sentence to the mandatory minimum of 15 years, or 180 months, where the guidelines recommended 228 to 270 months, was affirmed upon the reviewing Court's finding that the district court was not unreasonable, in part based on the Court's observation that the defendant "had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps."  *See also United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (where defendant convicted of mail fraud with loss of $150,000 and guidelines 18-24 months, sentence of probation with 3 months home detention not unreasonable in part because of Howe's twenty years of military service followed by honorable discharge.)  This principle has been further affirmed in Courts within the Tenth Circuit. For example, in a Tenth Circuit case, *United States v. Townley*, 472 F.3d 1267 (10th Cir. 2007), a middle-of-the-advisory-range sentence of 240 months for drug-trafficking offenses was not unreasonable where the district court considered, among other things, defendant's military service. *See United States v. Jager*, 2011 U.S. Dist. 21203 (D. N. Mex. Feb. 17, 2011) (In a possession of child pornography case, the district court denied a downward departure under the §5H1.11 guideline, finding that, in spite of the defendant's outstanding military record, his case did not fall outside the heartland of other similar pornography cases, but did consider defendant Jager's military service and granted a downward variance based on the § 3553(a) factors.).

Mr. Bunn's lengthy and exceptional military record is an inextricable part of the nature and circumstances of the offense and his history and characteristics; it is unavoidable that Mr. Bunn's service-related injuries, PTSD and intertwined mental illnesses contributed to his delusional behavior in the offense.

Mr. Bunn was in the United States Navy from January 1987 until July 1994.  From July 1994 until April 2010, Mr. Bunn was in the Army National Guard, United States Army, and United States Army Reserves.  Mr. Bunn served an 18-month deployment in Iraq and Kuwait during the height of the Iraq War.  PSIR ¶¶ 96-98.  According to the PSIR, record requests to the United States Navy and Army were unfulfilled, although the United States Probation Officer was able to confirm that Mr. Bunn was *honorably discharged* with the rank of Captain in the Army, qualified as an expert in rifle. *Id.* at ¶¶ 98-99.

As summarized in Mr. Bunn's Objections to the PSIR, filed herein at ECF Doc. #84 and further explored here, Mr. Bunn's military service was lengthy and extraordinary in nature: Mr. Bunn was in the service of the United States military for nearly twenty years, during which he was on the front lines of combat in the Iraq War, achieved the rank of Captain and was awarded a Combat Action Badge, among other decorations and medals. As a result of combat in Iraq, Mr. Bunn acquired significant hearing loss, severe PTSD and a serious head injury.

Mr. Bunn was a highly decorated soldier who earned the following medals and awards:  Army Commendation Medal; Army Achievement Medal; National Defense Service Medal; Global War on Terrorism Expeditionary Medal; Global War on Terrorism Service Medal; Army Service Ribbon; Overseas Service Ribbon; Armed Forces Reserve Medal w/m Device; and Combat Action Badge.  (Mr. Bunn's DD214, Certificate of Release or Discharge from Active Duty, attached hereto as Exhibit B and incorporated by reference herein.)

Several of these commendations highlight the exemplary nature of Mr. Bunn's service and differentiate him from other military members, and from other defendants. The Army Commendation Medal, also known as "ARCOM" "is granted for consistent acts of

heroism or meritorious service."[2] The Army Achievement Medal ("AAM") "is granted to personnel for outstanding achievement or meritorious service," and "can be granted in a combat area, but for non-combat meritorious service." *Id.* The Armed Forces Reserve Medal Ribbon ("AFRM") "with an 'M' device" is granted to any member of the Reserve or National Guard who is mobilized to an active-duty status. Mr. Bunn was ordered to active duty as a part of "Operation Enduring Freedom" on February 20, 2003.  Mr. Bunn's Mobilization Orders for Enduring Freedom is attached as Exhibit C and is incorporated by reference herein.  In summary, Mr. Bunn served the United States Military over an extensive period of time, in multiple capacities, for which he earned a number of commendations.

Further description of the nature of Mr. Bunn's service, outside of his commendations, also demonstrates that his service to the United States was laudable. During his time serving the United States Military, Mr. Bunn was a Platoon Leader and Tactical intelligence Officer. (A list of his Assignments is attached as Exhibit D and is incorporated by reference herein.)  His military records paperwork confirms he served in active duty in support of Operation Enduring/Iraqi Freedom; in Kuwait from May 19, 2003 through June 23, 2003; and in Iraq from June 24, 2003 through April 10, 2004.  See Exhibit B.  He ultimately achieved the rank of Captain.

In an Officer Evaluation Report from August 2003, recommending his promotion from First Lieutenant to Captain, Mr. Bunn's superior wrote:

> 1LT Bunn is a highly motivated and dedicated officer.  He has strong operational and organizational skills that he consistently uses in prepartin [sic] plans, orders, and various functions.  He displays acceptable leadership ability and possesses a sincere attitude for the welfare of his soldiers.  1LT Bunn is very detailed in his briefing and communications to ensure intent is fully

---

[2] https://www.usamm.com/pages/military-medals-and-ribbons-precedence-chart

> understood by all persons involved.  During Operation Iraqi Freedom, 1LT Bunn was extremely successful in securing and preparing an Iraqi facility to turn over to the Iraq Security Force. He was a driving force in the mobilization of the company and an integral part of a combat rehearsal exercise at Fort Carson, Colorado prior to deployment.  1LT Bunn should improve his engineer branch education through correspondence or attending EOBC.  He has the potential to be an excellent engineer officer.  Promote to Captain.

(Officer Evaluation Report ("OER"), dated August 2003, attached as Exhibit E, and incorporated by reference herein).

During Mr. Bunn's military service, he was also recognized for his work ethic, attention to detail, interest in the family support program, whereby he sought donations and gift certificates for the Company Christmas party and Family Support activity, and he displayed commendable leadership by demonstrating "keen ability to develop relations with neighboring units." *Id.*

Very shortly after his August 2003 OER, recommending his promotion to the rank of Captain, on the night of August 23, 2003, Mr. Bunn and his platoon were ambushed on their way back to their base in the town of Al-Hawijah.  Mr. Bunn and his platoon were bombarded with an improvised explosive device ("IED") followed by small arms fire.  The IED blast was nearby; Mr. Bunn and he suffered hearing loss and a suspected head injury.  The platoon fought their way out and all miraculously safely returned to base. (See, Memoranda describing the incident, attached hereto as Exhibit F and incorporated by reference herein). As a result of his bravery, Mr. Bunn's Commander requested that he be awarded the Combat Action Badge for personally being engaged by and engaging the enemy. (Recommendation attached hereto as Exhibit G, incorporated by reference herein.)

Based upon his military service record alone, Mr. Bunn is deserving of a departure

or variance.  He served the United States Military for decades of his life.  He was deployed in an active and dangerous war zone in Iraq and, nevertheless, excelled as a leader and soldier.  Mr. Bunn also was injured while serving his country, both physically and mentally.  Mr. Bunn has hearing loss in his left ear due to proximity to gunfire and he suffers chronic post-traumatic stress disorder complicated by combat experience in Iraq.  He qualified for and receives disability benefits from the Department of Veteran Affairs (VA) for his PTSD.  *See* PSIR, at ¶ 53.

The Guidelines provide that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  18 U.S.C.S. § 5H1.3.  Mental and emotional conditions may also be relevant in "determining the conditions of probation or supervised release; e.g., participation in a mental health program."  *Id.*

Upon returning from active combat in Iraq, Mr. Bunn was diagnosed with early onset PTSD and major depression at the Cheyenne VA Medical Center in February 2005.  He was 38 years old.  (Exhibit A, p 6).  He reported feeling that he was "different" after returning from the Iraq war and his wife at the time believed he was "a changed person." (VA Records, relevant excerpts, pp 704-706, attached as Exhibit H, and incorporated by reference herein.)  He and his wife began to experience marital discord which led to the ultimate demise of his marriage.

After returning from combat, he endorsed experiencing the following symptoms: "vivid flashbacks, rapid heart rate, sweating, intrusive thoughts, irritability with family members, a heightened startle responses in public and private, hypervigilance in public and

private, lack of future orientation, emotional distance and numbing, and depressed mood with low energy and anhedonia (an inability to experience pleasure).  He also reported episodes of tearfulness and disrupted sleep." (Exhibit A, p 6).  He was prescribed citalopram for depression/PTSD. (Exhibit H, p 704).  The citalopram improved his irritability, anxiety, and sleep disturbance.  (Exhibit A, p 6).  During therapy, Mr. Bunn discussed difficulties adjusting to civilian life, panic attacks and also difficulties with his spouse.  (Exhibit H, VA records p 704; Exhibit A, p 6).

After seeking help from the VA in 2005 and experiencing some improvement from the medication, Mr. Bunn dropped out of treatment and had a four-year lapse in treatment. This culminated in the suicidal ideations and near suicide attempt in 2009 as noted in the PSIR, ¶¶ 71-72.  As a result of this episode, Mr. Bunn was psychiatrically hospitalized for 11 days. (PSIR, ¶ 73; Exhibit A, p 6).  After this episode, he went on antidepressants and reentered therapy.  He was compliant for several years with medication, individual therapy, and group therapy.   (Exhibit A, p 6). During these periods of compliance, Mr. Bunn's symptoms were mitigated, demonstrating his ability to succeed in the community with appropriate supervision and access to services.

A line can be drawn from Mr. Bunn's military service to his declining mental health and delusional thinking, which highlights the need for appropriately tailored mental health treatment.  A note from group therapy at the VA on August 25, 2009 indicates the group discussed "how their mistrust of authority had its origins in the military where some commanders placed troops at risk of harm unnecessarily in the group members' view and how this has complicated their lives in terms of employment and academic settings." (See additional relevant excerpt from VA records p 642, attached as Exhibit I and incorporated

by reference herein.)

As summarized by Dr. Gundersen:

> Mr. Bunn's adjustment to civilian life was poor.  He had difficulty finding employment.  He experienced marital strife and financial problems.  He became seriously depressed leading to suicidal behavior in 2009 and an involuntary hospitalization for psychiatric care.

(Exhibit A, p 11).

Mr. Bunn's family relationships became more discordant and his behavior became more erratic.  In a December 2009 evaluation, his thoughts were described as "borderline psychotic." (Exhibit A, p 7).  Amidst familial strife and his divorce, in 2015 and 2016, he had suicidal ideations.   In February 2016, his psychiatrist considered psychological and neurocognitive functioning testing in order to determine whether he received a traumatic brain injury during combat and to rule out bipolar disorder. (Exhibit A, p 7).  This was, however, not done.

In 2016, Mr. Bunn started expressing to his therapist about his belief he had the ability to exorcise evil spirits, which only continued and became more grandiose.   He became "preoccupied by demon possession, with a belief that he could exorcise demons from possessed veterans."  *Id.* at 11.  In January 2017, "he was noted to be paranoid and 'possibly delusional' by a treatment provider" and formally "diagnosed with a brief psychotic disorder."  *Id.*  In February 2017, the Specialty Mental Health team became concerned about his continued use of prescription Adderall and the possibility it was "precipitating psychosis." *Id.* at 9.  His physician spoke with him in August 2019, less than a year before the start of the COVID-19 Pandemic and the conduct that resulted in this case concerning whether he should continue with Adderall and indicated that he would need to be evaluated

quarterly to continue receiving this medication.  His treatment ended at this point.  (Exhibit A, p 9).

The PSIR states that at the time of the offense, Mr. Bunn's "mental health diagnoses were untreated" and "his close friend, Ms. Taylor, noted his behavior deteriorated after the COVID-19 pandemic shut down services." (ECF Doc. # 86-1 at R-4).  As noted by Dr. Gundersen, there were no additional VA records to review after August 27, 2019. (Exhibit A, p 9).

As found by Dr. Gundersen in her recent evaluation of Mr. Bunn, he is "seriously mentally ill." (Exhibit A, p 11).  He has been "maintained on Adderall, a stimulant medication for ADHD for three years." *Id.* This medication "increases levels of the neurotransmitter Dopamine and can heighten paranoia as well as increase the risk for developing psychosis, both delusions and hallucinations." *Id.* Mr. Bunn has hearing loss, which can also "contribute to the development of paranoia." *Id.* It is important to note that Mr. Bunn was prescribed Adderall for significantly longer than three years, with his medical records in fact indicating that he was initial placed on Adderall in 1991. *See* Exhibit H, p 706.

Dr. Gundersen finds that Mr. Bunn "clearly meets criteria for a <u>Complex Post Traumatic Stress Disorder</u>," based on trauma at an early age in childhood (physical and sexual abuse) and as a Combat Veteran. *Id.* Dr. Gundersen even personally observed his "increased startle response to loud background noises." *Id.* at 10.

Dr. Gundersen found through her review of Mr. Bunn's medical records that, in 2017, he was "preoccupied with demons and was likely psychotic at that time." *Id.* at 12.  Later, he began visiting websites with extremist right-wing political views.  In Dr. Gundersen's professional opinion, Mr. Bunn's "underlying depression, paranoia and PTSD, and in the

context of extreme isolation, developed the delusional belief that he would be <u>unlawfully</u> <u>stripped of his weapons leading him to prepare for a forced entry by constructing pipe</u> bombs to defend himself and his property."  She ultimately opined; "<u>Absent his active mental</u> <u>illnesses, it is extremely unlikely that he would have engaged in such behavior.</u>"[3]  (Exhibit A, p 12) (emphasis added).

In addition to circumstances from Mr. Bunn's past which demonstrate his need for a sentence which allows him access to treatment, Mr. Bunn's more recent conduct should be considered in crafting an appropriate sentence.  Mr. Bunn has displayed exemplary conduct during his long pre-trial incarceration in this case despite facing a number of difficulties, including a Global Pandemic.

Mr. Bunn was transferred from secure housing while in the custody of the Federal Marshals Service to the Douglas County Detention Center ("DCDC"). This transfer was a result of his intervention on behalf of a guard who was endangered by another inmate.  As Mr. Bunn told a mental health professional at DCDC, he had stepped in and saved a guard from being killed by another inmate.  This came at a high personal cost to Mr. Bunn, and effectively placed a target on his back with other inmates.  This is confirmed in his inmate records from DCDC, where it is stated "On 3/3/21, Inmate Bradley BUNN (21-0755) divulged to Stacia with Mental Health that he had saved a guard from being killed in a former facility. This information fits the information we have from the US Marshals regarding Bunn's

---

[3] The conclusions reached by Dr. Gundersen suggest that Mr. Bunn may have been able to endorse an Insanity Defense, had he not elected to take responsibility by pleading guilty to every count in the Complaint. *See* 18 U.S.C.S. § 17 ("It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.")

status as a potential witness in another case. Nothing Further CB 0332".   Douglas County Detention Center, Inmate Incident Report, attached hereto Exhibit J, incorporated by reference herein.

While the insinuation by the Probation Officer is that Mr. Bunn harbors hostility toward law enforcement whom he viewed as enforcing unjust laws, however, this is simply not the case, and this incident is mitigating: Mr. Bunn risked his own life to protect a prison guard, an exemplary showing of bravery and selflessness for which Mr. Bunn should be recognized.  In the PSIR, the United States Probation Officer off-handedly states that Mr. Bunn "did not adjust well to his incarceration" and cites Mr. Bunn's desire to visit with his ailing Service Canine, who has since passed away, as indicative of an "entitlement issue" in the opinion of an anonymous staff member.  This Service Canine was prescribed by his Mental Health Professional at the Veteran's Hospital and "Captain" was trained and certified as an "Service Animal." Numerous VA service professionals supported Mr. Bunn in his recovery and recommended he be prescribed a service canine and "Captain" was Mr. Bunn's service canine and loyal companion and Mr. Bunn wanted to say thank you and good bye and the undersigned, along with AUSA David Tonini and the Agents in this case, arranged through the jail to allow for this last visit.  It meant the world to Mr. Bunn.  Letters from the VA attached hereto as Exhibit K, and are incorporated by reference herein.

The PSIR also provides a lengthy narrative regarding an incident where surveillance footage confirms that Mr. Bunn was attacked by another inmate and forced to defend himself. ECF Doc. #86, at ¶ 7. The initial characterization of this event on the initial PSIR essentially implicated Mr. Bunn with an out-of-context quote that Mr. Bunn did not "back down from bullies", ECF Doc. # 81 at ¶ 7, and further detail, namely that surveillance

footage demonstrated that Mr. Bunn was forced to defend himself was the only "correction" made to the final PSIR and was only added subsequent to defense objection.

Additionally, Mr. Bunn has attempted to be a mentor to a 211 Crew gang-affiliated inmate at the DCDC and to help him to leave the gang.  Records confirm that, according to Deputy C. Jackson, Mr. Bunn sought permission to meet privately with this inmate, who is openly gang-affiliated. Mr. Bunn stated that he "would like to help the inmate get out and accept God".  This further demonstrates Mr. Bunn's desire to engage in pro-social behavior and to be a positive member of his community, even when doing puts him at risk.  *See* Exhibit J.

The omissions from the PSIR of Mr. Bunn's commendable actions in intervening to rescue a guard and seeking to mentor gang-involved inmates, putting himself in both immediate and continuing peril, are concerning.  A fuller, more unbiased picture of Mr. Bunn demonstrates that he in fact, has great respect for the law and law enforcement, despite the characterizations set forth in the PSIR and his admirable actions while in custody should be considered by this Court, despite the PSIR's consistent downplaying of these events. Taken together, all the pertinent information demonstrates that Mr. Bunn's mental illnesses, rather than disrespect or disregard for the Government and Rule of Law, were the primary contributing factor to this case's events.

Mr. Bunn's past traumas, taken in conjunction with Dr. Gunderson's analysis of his mental health difficulties, demonstrate the necessity of Mr. Bunn receiving appropriate, consistent, stabilizing mental health treatment. Indeed, his positive behavior during his incarceration is indicative of Mr. Bunn's potential to learn pro-social coping skills and to successfully live in a community. While the PSIR recommends that Mr. Bunn receive

incarceration for 48 months, it also recommends mental health treatment. Exhibit A to the PSIR states: "His radicalized anti-government and anti-law enforcement behaviors are likely still part of his belief system and will need to be addressed in the correctional and community environments."  (ECF Doc. # 86-1 at R-4).

Exhibit A also advises addressing his diagnoses of post-traumatic stress disorder and delusional disorder "in a treatment setting." *Id.*  The PSIR also describes a number of "correcting and controlling" deterrent and intervention measures for Mr. Bunn's future use of internet and social media activity as well as associations with members of extremist anti-government groups.  Id. at R-4-6.  These are intended to foster reintegration in the community, deter future criminal activity and keep the community safe.  These are specific to either probation or supervised release and have no relevance in a Bureau of Prisons setting.

Mr. Bunn's access to medical care—specifically, consistent, appropriate mental health treatment—is an essential element of an appropriate sentence, and the strongest indicator that a sentence to "time-served" of 17 months with a term of supervised release would be an appropriate sentence and best meet Mr. Bunn's specific needs.

A 2006 Special Report from the Bureau of Justice indicates that while 43.6% of male inmates and 61.2% of female inmates in Federal prison were reported to have a mental health problem, a mere 24.0% of prisoners in the Federal system received treatment after admission but only 15.1% had "professional mental health therapy.[4]  The "treatment other than therapy" includes medication and an overnight hospital stay. *Id.*  Other information

---

[4] "Doris J. James & Lauren E. Glaze, *Bureau of Justice Statistics Special Report: Mental Health Problems of Prison and Jail Inmates* (2006), https://bjs.ojp.gov/content/pub/pdf/mhppji.pdf

indicates that these numbers may be even lower now: as of 2018, the Marshall Project reported that "The number of federal prisoners receiving regular treatment for mental illness fell 35% after a policy change took effect in May 2014."[5]  In February 2018, the Bureau of Prisons classified just 3 percent of inmates as having a mental illness serious enough to require regular treatment. *Id.* Under the circumstances, it is, unfortunately, extremely unlikely that Mr. Bunn will receive appropriate treatment if his incarceration continues and he is sent to the Bureau of Prisons for further imprisonment.

On the contrary, Mr. Bunn can access mental health services specifically tailored to his conditions in the community, while on Supervised Release.  While "[i]ncarcerated Veterans do not forfeit their eligibility for medical care… current regulations restrict VA from providing hospital and outpatient care to an incarcerated Veteran who is an inmate in an institution of another government agency ... This does not apply to Veterans who are released from a prison or jail into a temporary housing program (such as a community residential re-entry center or halfway house).  **VA may provide care once the Veteran has been released from the penal institution**. Veterans interested in applying for enrollment into the VA healthcare systems should contact the nearest VA healthcare facility upon their release."[6]  The Veteran's Administration further provides support through the Health Care for Re-entry Veterans (HCRV) Program, which is "designed to help incarcerated Veterans successfully reintegrate back into the community after their release."

---

[5] Christie Thompson & Taylor Elizabeth Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project (Nov. 21, 2016, 6:00 AM), https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons?ref=hp-1-100.

[6] U.S. Dep't of Veteran Aff. Veterans Benefits Admin., *Justice Involved Veterans*, https://www.benefits.va.gov/BENEFITS/factsheets/misc/JusticeInvolved.pdf

*Id.*

Simply put, "[a]bsent [Mr. Bunn's] active mental illnesses, it is extremely unlikely that he would have engaged in [the instant offense]."  (Exhibit A, p 12). The treatment of his significant underlying mental health conditions is the most paramount consideration in crafting an appropriate sentence.  Mr. Bunn has been continuously incarcerated for 17 months; a non-Guidelines sentence which would allow him to be released into the community with a sentence of "time served" and a term of Supervised Release with mental health conditions to include VA services is the quickest path to connecting Mr. Bunn with necessary mental health services, which are amply available through the VA.   In contrast, Mr. Bunn is unlikely to receive appropriate mental health treatment, if he receives any mental health treatment at all, while in the custody of the Bureau of Prisons.

## CONCLUSION

As outlined herein, Mr. Bunn therefore respectfully requests that this Honorable Court impose a sentence that is ***sufficient but not greater than necessary*** to achieve the purposes as outlined in 18 U.S.C. § 3553(a) and for Mr. Bunn that sentence is "time-served" for his 17 months of imprisonment followed by a term of Supervised Release.

DATED: September 28, 2021.                    Respectfully Submitted,

                                                                s/Lisa A. Polansky
                                                                Lisa A. Polansky, Attorney
                                                                Polansky Law Firm, PLLC
                                                                4999 Pearl East Circle, Suite 201
                                                                Boulder, Colorado 80301
                                                                Phone: (303) 415-2583
                                                                FAX: (720) 500-6021
                                                                Email: lisa@polanskylawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all other counsel of record.

s/Lisa A. Polansky